HUBBARD et al., Appellants, v. KANSAS CITY STAINED GLASS WORKS & SIGN COMPANY et al.

Division Two, March 30, 1905.

1. **EVIDENCE: Remote Transactions.** The courts look with disfavor upon efforts seeking to overthrow business and judicial transactions, which occurred forty or fifty years ago, to which for that time neither the remaindermen nor the preceding life tenant objected, but in which both have always heretofore acquiesced.

2. **TITLE BOND: Power to Execute: Acquiescence.** In June, 1856, the owner of an addition in Kansas City sold two lots to a married woman, but whether by written or oral contract is not shown. She and her husband went into possession and began to construct a house, the vendor living near by and knowing of their acts. Thereafter in September, having sold the rest of the lots, he executed a deed which omitted these lots, and took a mortgage for the deferred payments, executed a power of attorney authorizing his agent to sell real estate, make deeds therefor, collect all money due him, and to release any lot from the lien of a mortgage, and went to Iowa, and in November his agent in his name executed a title bond to the woman, reciting that his principal had "bargained and sold" the lots to her and that she had "agreed to pay for said land $400 within 5 years," etc., and this title bond was afterwards assigned by her and her husband and the assignee executed his note for the same amount and delivered it to the principal in the title bond and it was found among his papers after his death, and afterwards fully paid. *Held*, that the title bond was executed as additional evidence of the contract of sale which was made by the principal, and that the heirs of the principal are in no position to urge that the agent did not have power to execute it, for the principal, by his actual knowledge of their improvements

and by accepting the note executed by the assignee of his vendee, acquiesced in the title bond made by his agent, and his acquiescence in the sale was such that it is not necessary to discuss the power of the attorney to execute the title bond.

3. **CONTRACT: Statute of Frauds: Performance.** A contract to pay $400 for land five years after date of sale is not void if the maker entered into possession and improved the premises and the vendor afterwards accepted a note for the same amount from the assignee of the vendee and the note was made to bear the same date as the contract of purchase and was afterwards fully paid by those claiming under the assignee.

4. **————: Purchase of Land: Assignable Interest: Sale Under Execution.** Where the purchaser of land, whether under a verbal or written contract, enters, by acquiescence of the vendor, into possession and improves it, and assigns his interest therein, and the purchase-money is by the assignee fully paid to the vendor's estate, the purchaser had such an assignable interest as a court of equity, at the suit of the assignee, will enforce by decreeing the title to be in the assignee; and if before payment by the assignee his interest in the land is sold under execution and the purchaser at such sale pays the money due the original vendor, and enters into possession and has since remained in possession, he likewise becomes the owner of the equitable title, and is entitled to specific performance whenever ejectment is thereafter brought by the original vendor's heirs (remaindermen) although it is nearly fifty years after the sale was first made.

5. **————: ————: ————: Abandonment: Civil War: Specific Performance.** The purchaser of lots agreed to pay for them in five years, entered into possession, built a house, and assigned his interest to another for a valuable consideration, and the assignee went into possession but did not pay the purchase money and remained in possession until the Union soldiers appeared, when he joined the Confederate army, and the premises were occupied by his tenant who paid rent to his agent for eighteen months and until he was notified by the provost marshal to pay no more money to the assignee because the assignee was in the Confederate army. *Held,* that there was no such abandonment of the premises by the assignee as barred him from maintaining an action for the specific performance of the contract of purchase.

6. **JUDICIAL SALE: Collateral Attack: After Forty Years.** The court will not hold in a collateral proceeding that a deed regular on its face, reciting every essential fact, made forty years ago

by the sheriff in pursuance of an execution issued out of the circuit court upon a judgment therein rendered, is invalid and insufficient to pass title.

Appeal from Jackson Circuit Court.—*Hon. J. H. Slover*, Judge.

AFFIRMED.

*English & English* for appellants.

(1) There was no authority in Summers to make this title bond. His duty was "to grant, bargain, sell and convey" and he could make no instrument that did not include all of these powers. It gave him no authority to bind Hubbard to convey. This was not a contract to convey, under the power of attorney, but an option which he could not give. Glass v. Rowe, 103 Mo. 538. Even if it gave the power to make a contract, and this could be construed as such, it was not a reasonable contract. He could not cut Hubbard's property up into useless slices, as he attempted to do. He must make such contract as would give to Hubbard some rights. In other words, he must make a reasonable contract. To bind Hubbard alone, would be beyond his authority. He must make it with one capable of contracting, and not with a married woman, who would not be bound by her contract, and against whom a contract could not be enforced. He must make such a contract and with such party that it could be enforced in favor of his principal. He can only make a contract mutually binding his principal and the party with whom he contracts. 1 Am. and Eng. Ency. Law, 942; Evans on Agency, 166; Glass v. Rowe, 103 Mo. 538; Elwell v. Shaw, 16 Mass. 42; Wells v. Evans, 20 Wend. 251; Tippets v. Walker, 4 Mass. 595; Sheldon v. Dunlap, 1 Harrison 245; Strohucker v. Bank, 8 Watts 188; Spensor v. Field, 10 Wend. 87; Bayer v. Miller, 4 Wash. 280. This title bond was a unilateral contract and could not be en-

forced.   There is nothing in the contract that compels the vendee to purchase, and therefore it can not be enforced.   Sugden on Vendors, p. 217; Pomeroy on Specific Performance, p. 58; Mastin v. Halley, 61 Mo. 196. (2) Taking the recitals in the bond to be true, it was a verbal agreement that Mrs. Toler had agreed to pay $400 after five years, it recites a void agreement, because it is not to be performed in a year.   Tyler on Ejectment, 554.   Maughs, if he entered under Toler, could not by parol evidence connect his title to Toler's.   Wells v. Evans, 20 Wend. 251.   He could get no right except such as Toler had.   He had by his contract with Toler no right to possession.   The actual occupancy he abandoned.   Neef v. Seely, 49 Mo. 215; Green v. Covilland, 10 Cal. 309; sec. 5, Stat. Frauds and Perjuries; Wood on Stat. Frauds, sec. 386.   (3) It is claimed by the defendants that the interest which they claim G. M. B. Maughs received from Toler was sold on execution in the case of Canole v. Smith et al., and that, under said execution sale, said property was purchased by Miller.   Maughs had no vendible interest.   Summers' bond to Toler did not bind Toler to pay.   She was a married woman and could not be bound.   There is no evidence that she paid anything to Hubbard, or that Maughs paid anything, or that possession was ever given to either by Hubbard under that bond.   It did not provide for such possession.   Toler had no interest that could have been sold on execution, and by assignment of the title bond (had it been valid) she gave nothing to Maughs that could have been sold on execution.   Priest v. Robinson, 16 Mo. 129; Quell v. Hamilton, 81 Mo. 444; Anthony v. Rogers, 17 Mo. 397; Hart v. Logan, 49 Mo. 50; Neef v. Seely, 49 Mo. 209; Block v. Morrison, 112 Mo. 343; McIlvane v. Smith, 42 Mo. 55; Rogers v. Cary, 46 Mo. 337.   (4) Claim of entry under title bond is not hostile.   "A purchaser under an executory contract can not set up adverse possession until he has fully per-

formed his contract and is entitled to conveyance."
Tyler on Ejectment, 924; Jackson v. Smith, 7 Cow.
717; Brooman v. Shepard, 14 Barb. 441. "A bond for
conveyance does not constitute color of title under
which party can claim adverse possession against his
vendor." Osterman v. Baldwin, 6 Wall. 116; Dunlap
v. Dougherty, 20 Ill. 404; Rigor v. Tracy, 62 Ill. 507;
Hardin v. Crate, 78 Ill. 533; Ridgway v. Holliday, 59
Mo. 453; Draper v. Shoot, 25 Mo. 204. "Possession for
one hundred years is no bar." Cole v. Roe, 39 Mo.
410. "Vendor may have ejectment against the pur-
chaser when he fails or refuses to comply with the con-
tract." Enc. of Pleading & Practice, 319; Debernardi
v. McElroy, 110 Mo. 656; Burnett v. Caldwell, 9 Wall.
290; Gibbs v. Sutton, 48 Mo. 237; Fulkerson v. Brown-
lee, 69 Mo. 371; Roe v. Perkins, 98 Mo. 253. "An offer
to purchase land by a party in possession is such a rec-
ognition of title as will bar the defense of adverse pos-
session." Tyler on Ejec., 921; Jackson v. Brittian, 4
Wend. 507; Jackson v. Cunaon, 2 John. 353; Liggett v.
Morgan, 98 Mo. 39. By accepting a deed from the life
tenant, Miller and his grantees are estopped from de-
nying the title of the remaindermen, and can not claim
adverse possession against them. Keith v. Keith, 80
Mo. 125; Salmon v. Davis, 29 Mo. 176. But Maughs
had surrendered and could not have intended to hold
adversely; the continuity was broken. 1 Am. and Eng.
Ency. Law (2 Ed.), pp. 1, 841; Hickman v. Link, 116
Mo. 123.

*Powell & Powell* and *Lathrop, Morrow, Fox &
Moore* for respondents.

(1) This sale by Hubbard to Toler, the delivery of
possession, the erection of a house by Toler thereon,
and the subsequent payment of the purchase-money and
interest to William Holmes, the administrator of Hub-
bard, will defeat a recovery by these plaintiffs, even

had no deed been made by the administrator at all, as even a verbal sale, delivery of possession to the purchaser and payment of the purchase-money will defeat a recovery in ejectment. Williams v. Mitchell, 112 Mo. 313; Harris v. Vineyard, 42 Mo. 568. If the purchase-money has not been paid and an action in ejectment is brought, the purchaser will not be ousted but will be allowed to pay even after suit brought, and if he does so plaintiff could not recover. Fulkerson v. Brownlee, 69 Mo. 371. The purchaser in this case, Toler, placed valuable improvements on this land by the erection of a building, and the rights of their grantees will be protected. Dickerson v. Chrisman, 28 Mo. 134; Alexander v. Alexander, 150 Mo. 579. (2) The real estate having been paid for in full to the representative and administrator of Chester Hubbard's estate, will preclude plaintiffs from a recovery. Williams v. Mitchell, 112 Mo. 313; Fulkerson v. Brownlee, 69 Mo. 371. While this contract of sale to Toler was in the form of a title bond, yet it is also good as a contract of sale, whether the attorney in fact had or had not the power to enter into a contract in the form of a title bond, and as a contract of sale it will be enforced. Vanada v. Hopkins, 1 J. J. Marsh. 292; Lyon v. Pollock, 99 U. S. 668; Jones v. Marks, 47 Cal. 243. (3) Possession was delivered, and the Statute of Frauds has no bearing on the case. If she or her grantees retained the land they had to pay for it. (4) This was an executed contract. A seller, when he sells and puts a party in possession, has so performed that he may recover the purchase-money, and there is in effect a vendor's lien for the same against the land bought. (5) There was no abandonment by Toler or Maughs. The breaks, if any, by Maughs during the war were because he was a Southern man and in the Confederate army, and the Federal troops and Federal authorities were in possession of his property. This interference by Federal authority is no evidence of an abandonment. Williams v. Mitch-

ell, 112 Mo. 300; Hamilton v. Boggess, 63 Mo. 246. (6) When a contract of sale is made, the interest of the vendor is personalty so as to pass to his personal representative, and if the sale be a verbal sale and possession is delivered the balance of the purchase-money is personal property, and this is so whether the contract of sale be verbal, and possession delivered, or in writing, and in either event the balance of the purchase-money, under either a verbal contract or written contract, is personal property. Moore v. Burrus, 34 Barb. 173; Schroeppel v. Hopper, 40 Barb. 425; Skinner v. Newberry, 51 Ill. 203; Fuller v. Bradley, 160 Ill. 55; Sutter's Heirs v. Long, 25 Pa. 466; Rose v. Perkins, 98 Mo. 258. (7) The note for the purchase-money matured prior to the death of Hubbard and this started the Statute of Limitations running, and the obligation would be barred even had the note not been paid. Williams v. Mitchell, 112 Mo. 311. An action for the balance of purchase-money to enforce a vendor's lien must be brought within ten years. Zoll v. Carnahan, 83 Mo. 41. After the lapse of twenty years a debt is barred, and this is so at common law, independent of and unaffected by the Statute of Limitations. Carr v. Dings, 54 Mo. 95; Williams v. Mitchell, 112 Mo. 311. (8) Possession under a title bond for the full period of limitation would bar judgment and is a good defense by heirs, even though they be remaindermen and had no right to sue until the Statute of Limitations had expired, because the title bond was the act of their ancestor before his death. Bozeman v. Browning, 31 Ark. 378. (9) Maughs and Toler had vendible interest in this property and the assignment from Toler to Maughs, and delivery of possession, and the judgment, execution, levy and sale against Maughs, carried all their interest. Matney v. Graham, 59 Mo. 192; Rosenberger v. Jones, 118 Mo. 559. (10) This sheriff's deed is not open to collateral attack, and carries the interest of Maughs to Miller. Shea v. Shea, 154 Mo.

607; Hardin v. Lee, 51 Mo. 244; Houck v. Cross, 67 Mo. 155; Curd v. Lackland, 49 Mo. 451; Reed v. Austin, 9 Mo. 722. (11) A stranger can not attack such sheriff's deed either in a collateral or in a direct proceeding. Hardin v. Lee, 51 Mo. 241; Houck v. Cross, 67 Mo. 155; Curd v. Lackland, 49 Mo. 451. (12) Where specific performance of a contract will be decreed between the original parties, similar relief will be given in an action between parties claiming under them. Hagman v. Schaffner, 88 Mo. 29. A purchaser at execution sale may bring an action for the specific performance of a contract which the execution debtors held for the purchase of the land. Burke v. Seely, 46 Mo. 334; Rosenberger v. Jones, 118 Mo. 559; Crispen v. Hanniman, 50 Mo. 549; Choquette v. Barada, 23 Mo. 337; Jackson v. Magruder, 51 Mo. 59; Fulkerson v. Brownlee, 69 Mo. 371; In re Ferguson, 124 Mo. 574.

FOX, J.—This is an action of ejectment brought by Joseph R. Hubbard and Ellen L. Jeffries, formerly Ellen L. Hubbard, and her husband, H. B. Jeffries, against Kansas City Stained Glass Works & Sign Company, tenant, and Ira F. Brainard, owner and landlord, defendants.

Joseph R. Hubbard and Ellen L. Jeffries are sole children of Chester Hubbard and wife, Mary R. Hubbard. Chester Hubbard died July 3, 1861, in Lee county, Iowa, plaintiff claims, leaving a will by which he left all of his property to his widow, Mary R., during her lifetime, and after her death to his children. Mary R. Hubbard died February, 1900, and his children are now claiming this property in suit.

In the year 1855 Chester Hubbard owned a tract of land in Kansas City, Missouri, which he, on November 29, 1855, platted into an addition known as Hubbard's Addition to Kansas City.

It can serve no useful purpose to burden this opinion with a reproduction of the pleadings upon which the

cause was tried; it is sufficient to say, that the pleadings were broad enough to admit of the testimony offered at the trial.   There is a dispute as to the facts, hence we have read in detail the abstract furnished by plaintiffs and the additional one filed by respondents. The testimony as preserved and disclosed by the record tends to show the following state of facts:

In June, 1856, Chester Hubbard, who is the conceded common source of title, sold the lots in controversy, part of lots 78 and 79, to Susan A. Toler—the testimony does not disclose that this contract of sale to Mrs. Toler in June, 1856, was evidenced by any writing; but the Tolers, under the contract, went into possession and began to make improvements—Hubbard residing near this property, and from all the circumstances in proof, it is a perfectly legitimate inference that he knew of such possession, consented to it, in fact authorized it.   The testimony as to the transaction between Hubbard and the Tolers, in June, 1856, does not disclose that anything was paid at that time.

On September 8, 1856, Hubbard and wife sold all of his remaining lots, then unsold, in Hubbard's Addition, to H. H. King—this deed omitted the lots sold to Mrs. Toler.

At the time Chester Hubbard made this sale to King, September 8, 1856, Toler was at work excavating and building a house on the lot which Hubbard had sold to him.

Hubbard and wife, after they had sold the remaining unsold lots in Hubbard's Addition to H. H. King, September 8, 1856, in preparing to leave Kansas City for Iowa, made a power of attorney, dated September 8, 1856, to John W. Summers, authorizing him to sell real estate and make deeds thereto and receive and collect all sums of money which shall become due and payable to said Hubbard by reason of such sale or sales, and to collect and receive all money and debts payable to said Hubbard and to perform such other

general business as becomes necessary, giving unto the said attorney full power and authority to do and perform all and every act and thing whatsoever requisite to be done in and about the premises as fully to all intents and purposes as said Hubbards might or could do if personally present, also adding onto said power of attorney the authority to release any lot from the operation of the mortgage given by King to Hubbard for the purchase-money for "part of that tract of land known as Hubbard's Addition to the City of Kansas, being forty lots of said addition," upon the payment by King of a certain sum, which power of attorney was acknowledged and duly recorded in the office of the recorder of deeds of Jackson county, Missouri, on October 16, 1856. Hubbard and his family then moved to Iowa.

On November 27, 1856, Chester Hubbard and wife, by John W. Summers, made a title bond to Susan A. Toler to part of said lots seventy-eight and seventy-nine, the property in controversy, which was acknowledged and recorded in the office of the recorder of deeds of Jackson county, Missouri, on December 8, 1856. This title bond recites as follows, to-wit: "Know all men by these presents that I, Chester Hubbard, by John W. Summers, my attorney in fact, am held and bound to Susan A. Toler in the sum of eight hundred dollars," . . . and further recites, "The condition of this bond is that whereas said Chester Hubbard has bargained and sold unto the said Susan A. Toler the following described real estate," being the lots in controversy, "and whereas said Toler has agreed to pay for said land four hundred dollars, within five years from the 27th day of June, 1856, together with ten per cent per annum, payable semiannually," then recites that if the money is paid a warranty deed shall be made to them" . . . then, "Signed and sealed the day and year above first written. John W. Summers (Seal), attorney in fact for Chester Hubbard."

Susan A. Toler and George W. Toler made a written assignment, dated May 19, 1857, to G. M. B. Maughs, of the title bond above named made to Susan A. Toler by Hubbard by J. W. Summers his attorney in fact, which assignment was duly acknowledged before Sands W. Bouton, a notary public, and recorded May 29, 1857, in the recorder's office of Jackson county, Missouri, which assignment recited that they, Susan A. Toler and George W. Toler, "in consideration of $2,400 to us paid and secured to be paid by G. M. B. Maughs, grant, bargain, sell and convey unto him, the said G. M. B. Maughs, all our right, title and interest in and to a certain title bond executed by Chester Hubbard to Susan A. Toler," fully describing it, "together with all our rights and title to the premises."

G. M. B. Maughs made a note for four hundred dollars, dated June 27, 1856, due five years after its date, bearing interest at ten per cent per annum, and this note was delivered to Chester Hubbard and was among the assets which came into the possession of Mary R. Hubbard, as executrix of Chester Hubbard, upon his death, and she caused the same to be appraised as a part of the personal estate of Chester Hubbard, deceased.

Maughs, after his purchase above named, plastered the house and moved into it and lived in it until the spring or summer of 1861.

Maughs's note to Chester Hubbard for four hundred dollars, dated June 27, 1856, due five years after date, became due June 27, 1861. Chester Hubbard died in Iowa July 3, 1861, after the maturity of the note.

Chester Hubbard left a will naming his wife Mary R. Hubbard as executrix, and she was appointed executrix by the probate court of Lee county, Iowa, in September, 1861. Other notes made by King and others for real estate sold to them by Hubbard in his lifetime, were also among the assets which came into her hands as executrix in Iowa. By reason of the un-

settled conditions in Jackson county, Missouri, growing out of the war, nothing was or could be done by her toward their collection until the close of the war. In July, 1865, she came to Kansas City, Missouri, and caused William Holmes to be appointed administrator with the will annexed of the estate of Chester Hubbard, by the probate and common pleas court of Jackson county, on July 24, 1865. She delivered this Maughs note to Holmes as such administrator, and Holmes, with Mrs. Hubbard, proceeded to collect this note. William Miller was then in possession of the property, and the amount of the note was paid to William Holmes as such administrator by William Miller, August 22, 1865.

G. M. B. Maughs purchased this house and lot from Toler and wife in 1857, and received from them the written assignment, dated May 19, 1857, of the title bond from Hubbard, by his attorney in fact, J. W. Summers, to Toler, and this note which he gave to Hubbard for four hundred dollars, dated June 27, 1856, due in five years, and bearing interest at the rate of ten per cent per annum, corresponded in every detail with the recitals in the title bond as to the amount which the Tolers had promised to pay to Hubbard for this land.

On December 10, 1860, a judgment was rendered by the circuit court of Howard county, Missouri, in favor of Nancy Canole and against Reed, Smith and G. M. B. Maughs, for $593.35.

On January 31, 1861, the clerk of the Howard County Circuit Court issued an execution on said judgment against Maughs et al., to the sheriff of Jackson county, Missouri, and on February 21, 1861, the sheriff levied on this property as the property of Maughs.

By reason of the unsettled conditions in Jackson county, growing out of the war, no term or session of the circuit court of Jackson county was held at which the sheriff could make sale of this property from date

of levy of execution, February 21, 1861, until March 15, 1865, and this execution was not further executed until March term, 1865, because of this fact.

The regular March term, 1865, of the circuit court of Jackson county began March 14, 1865, and was in session March 15, 1865.

The sheriff's deed to William Miller, hereafter referred to, recites that this execution was returned to the clerk of the circuit court of Howard county, in the latter part of the year, 1862, reciting that no sale had been made because no term of court had been held in Jackson county, at which it could be made.

On January 3, 1863, the circuit court of Howard county made an order directing the clerk of the said county to issue a writ of execution, or *venditioni exponas*, as it is sometimes called in these proceedings. The clerk issued this writ January 9, 1863, but no sale of the property was had until March 15, 1865, because no term of court was held at which a sale could be made. But this property was advertised and sold under the judgment, execution and levy made February 21, 1861, at the first term at which a sale could be made under this levy, viz., the March term, 1865, which began March 14, 1865, and this property was sold by the sheriff on March 15, 1865, to William Miller, who paid his bid of $75 to the sheriff therefor.

On March 15, 1865, John G. Hayden, as such sheriff, made a sheriff's deed to said William Miller to this property, which was duly recorded March 15, 1865, and William Miller, after receiving such deed, entered into possession and moved into the house.

William Miller, after the purchase at sheriff's sale and the deed of March 15, 1865, on August 22, 1865, filed his petition in the probate and common pleas court of Jackson county, Missouri, setting up a sale by Hubbard to Toler, an assignment by Toler to Maughs of the Toler contract, the fact of the four hundred dollars of the purchase-money and interest thereon and the

note therefor remaining unpaid to Hubbard, the sale
of the Maughs interest, under the judgment and ex-
ecution against Maughs in favor of Nancy Canole, and
the purchase thereof by Miller, and asking for an order
directing Holmes, as administrator of Hubbard's
estate, to enforce Hubbard's contract to sell and to
make to William Miller a deed on the payment of the
balance of the purchase-money, to-wit, four hundred
dollars and interest, at that time amounting to over
nine hundred dollars. The probate and common pleas
court made the order directing Holmes, as such admin-
istrator, to make to Miller an administrator's deed
upon the payment of the amount of the principal and
interest of the purchase-money due Hubbard. Miller
thereupon paid to Holmes, as such administrator, the
sum of nine hundred and thirty dollars, principal and
interest, and Holmes made him, Miller, an adminis-
trator's deed, conveying said land, which was recorded
by said Miller in the office of the recorder of deeds on
August 30, 1865.

William Holmes, as administrator with the will
annexed of the estate of Chester Hubbard, filed his
first annual settlement May 1, 1866, in which he ac-
counted for this money collected from the note made
by Maughs to Hubbard for this land in the following
language: "To cash received of William Miller in case
of said Miller v. Administrator in Probate Court, being
full amount due on note of G. M. B. Maughs on in-
ventory, $930.30."

William Holmes, as such administrator, collected
other sums from King and others on notes made to
Chester Hubbard, and which came into possession of
Mary R. Hubbard as executrix in Iowa; and which she
turned over to William Holmes, upon his appointment
as administrator here, for collection, amounting, as
shown by this first settlement alone, to over eight thou-
sand dollars. This first settlement shows that he paid
to her, as such foreign executrix, the money which he

had collected from William Miller on this Maughs note, the payments to Mary R. Hubard, foreign executrix, being in the following language: "By cash paid Mary R. Hubbard, executrix in Iowa of said estate, $891.40." Other credits are made in practically the same language, amounting in the total in the first year's settlement to over six thousand dollars, which he paid to her as executrix in Lee county, Iowa. Hubbard left in 1861 practically no property save these Kansas City notes.

Maughs left Kansas City in the Spring of 1861, and went into the Confederate Army, where he remained until the end of the war and did not return to Kansas City until about 1866.

Toler began to erect a house on the lots at once after the purchase, and built the house in the summer and fall and lived in it until he sold it to Maughs in 1857. Maughs lived in it until the spring of 1861, and while he lived in it the entire lot was inclosed with a fence.

When Maughs left Kansas City to go into the Confederate Army, the Federal soldiers came and took possession, the officers moving into the house and the soldiers occupying the premises for a time.

Frank L. McHenry, in 1862, rented the premises and occupied them as Maughs's tenant for from one and a half to two years, and when he moved into it the house was in good repair and the lot entirely fenced. He, McHenry, was notified by the United States provost marshal, to quit paying rent to Maughs, and he did so, and a few months afterwards vacated the premises. The United States authorities assumed charge of all the property owned by the soldiers in the Confederate Army, and placed in this property Union refugees, after McHenry moved out of it.

William Miller, upon his purchase at sheriff's sale, March 15, 1865, moved into the premises.

The property was assessed by the city to G. M. B. Maughs, in 1858 and 1860, and the taxes are marked

paid for those years, the other city books from 1857 to 1863 being lost. In 1863 and 1864, the property was sold for taxes by the city, and Miller redeemed, and Miller and his grantees have paid the taxes from that period up to the present time. Neither Hubbard in his time nor his widow or heirs have ever paid or offered to pay taxes on this property.

Dr. G. M. B. Maughs and his wife made a quit-claim deed to Russell Hicks, December 7, 1868. Russell Hicks was adjudged a bankrupt in 1876, and the assignees in bankruptcy of Russell Hicks made a quitclaim deed to this same property, March 31, 1879, to William Miller.

In September, 1873, John G. Hayden, as late sheriff, made a second sheriff's deed to William Miller, to the property, reciting all the steps from the date of the judgment against Maughs on December 10, 1861, down to the date of the sale to William Miller, under the judgment, on March 15, 1865. Judge Francis M. Black drew this second deed and testifies that the facts recited in the deed were taken from the original papers and records which he then had before him.

The files and papers in the case of Canole v. Reed, Smith and Maughs in the circuit court of Howard county, Missouri, have been lost.

On April 20, 1869, Joseph R. Hubbard was then over the age of twenty-one years, he having arrived at the age of twenty-one years in October, 1868. Nellie Hubbard, now Mrs. Jeffries, did not arrive at the age of eighteen years until October 19, 1875, and she was married to Horace B. Jeffries, a year later, on October 23, 1876.

William Miller conveyed this property to J. E. Gaylord, Turner A. Gill and Gardiner Lathrop, April 22, 1878, by a warranty deed which was duly recorded, and they, Gaylord, Gill and Lathrop and wives conveyed the same to J. R. Williamson January 21, 1879,

by warranty deed, and J. R. Williamson and wife conveyed, by warranty deed, to defendant Brainard on March 15, 1887.

The house that Toler erected on the premises in 1856, which was plastered by Maughs after he moved into it in 1857, remained on the lot and in the actual possession of Maughs and his tenant, except during the period it was occupied by the United States forces and in their possession, and of William Miller and his tenants and grantees, Gaylord, Gill and Lathrop, and their tenants, down to 1881, in which year J. R. Williamson, the purchaser from Gaylord, Gill and Lathrop, tore down the building and erected a substantial brick building on the lot, at a cost of from seven to eight thousand dollars, and expended a total in improvements of about twelve thousand dollars, and Williamson and Brainard and their tenants have been in actual possession to this date.

Upon the submission of this cause to the court, it found the issues for the defendants, and entered its decree, quieting the title to the premises in dispute, in the defendants. Motions for new trial and in arrest of judgment were filed and by the court overruled, and plaintiffs in due time and form prosecuted their appeal to this court and the cause is now before us for consideration.

### OPINION.

It is apparent from the record in this cause that the trial court in the disposition of it necessarily had to deal with business transactions in respect to the property in dispute, which occurred nearly a half century ago.

The plaintiffs by this suit seek to recover property which was owned by their ancestor over forty years ago, the possession of which was surrendered by him in the year 1856, and neither the ancestor nor his heirs

have ever regained or sought to regain the possession of said premises, nor was there any claim of ownership to said property made for over thirty years after the surrender of the possession of the same to the party who, it is claimed, purchased the property from the ancestor in 1856.

In view of this disclosure by the record it is not out of place to remark, at the very inception of the discussion of the legal propositions presented for our consideration, that this court has given expression to its "disfavor of efforts seeking to overthrow business and judicial transactions, which have occurred at a remote period, and of the liberal presumptions that it would indulge in order to prevent irregularities or imperfections in such transactions from being held fatal." [Williams v. Mitchell, 112 Mo. l. c. 313, and cases cited.]

ANGEW, J., in Richards v. Elwell, 12 Wright (48 Pa.) l. c. 364, 367, said: "If the rule which requires the proof to bring the parties face to face and to hear them make the bargain, or repeat it, and to state all its terms with precision and satisfaction, is not to be relaxed after the lapse of forty years, when shall it be? . . . There is a time when the rules of evidence must be relaxed. We cannot summon witnesses from the grave, rake memory from its ashes, or give freshness and vigor to the dull and torpid brain." [See, also, 2 Wharton on Evidence, secs. 1338-1352.]

Numerous errors are assigned by learned counsel for appellant in the disposition of this case by the trial court, and we will give the errors complained of such attention as their importance demands.

First, it is contended by appellant that John W. Summers had no power to execute the title bond introduced in evidence. A careful consideration of the testimony as developed at the trial of this cause plainly shows that the appellant is in no position to urge this contention. When all the evidence as to the sale made

by Chester Hubbard, the plaintiff's ancestor, of the land in dispute in June, 1856, is considered, it fully warranted the court in concluding that there was, in fact, a sale made by Chester Hubbard to Mrs. Toler in June, 1856. The Tolers under such contract of sale took possession of the land and began the erection of a house on it during the summer of 1856, and completed it in the fall, except plastering. The testimony clearly indicates the surrendering of the possession of the premises to the Tolers, and Hubbard, at the time of the taking possession of the lots in controversy by the Tolers, had a home and was residing on an adjoining lot, and it is sufficient to at least indicate that he had knowledge of such possession and of the improvement that was being made upon the premises by the Tolers, to whom he had sold the property. On September 8, 1856, after the sale of this property to Mrs. Toler, Hubbard and wife executed their power of attorney to John W. Summers, authorizing him to sell real estate and make deeds thereto and receive and collect all sums of money which should become due and payable to said Hubbard by reason of such sale or sales and to collect and receive all money and debts payable to said Hubbard and to perform such other general business as became necessary, giving unto said attorney full power and authority to do and perform all and every act and thing whatsoever requisite to be done in and about the premises, as fully to all intents and purposes as said Hubbard might or could do if personally present.

The title bond executed by John W. Summers was dated on November 27, 1856, and it is apparent, when all the facts and circumstances are considered surrounding this transaction, that this bond was simply executed as additional evidence of the contract of sale, which was made in the first place in June, 1856, by Hubbard himself. This is made manifest by the conditions recited in the bond as follows: The condition

of this bond is, that "whereas said Chester Hubbard has bargained and sold unto Susan A. Toler the following described real estate," being the lots in controversy, "and whereas said Toler has agreed to pay for said land four hundred dollars within five years from the 27th day of June, 1856, together with ten per cent per annum, payable annually." It is clear from that recitation in the bond that Mr. Summers, by the execution of the bond, was simply undertaking to evidence a contract of sale which was made in June, 1856, with Mrs. Toler. It further appears that Mrs. Toler and her husband made a written assignment in May, 1857, of all their title and interest in and to the title bond executed by Summers as the agent of Chester Hubbard, to G. M. B. Maughs; the consideration for this assignment was $2,400. It was further developed by the facts in this case that G. M. B. Maughs executed his note for $400, dated it back to June 27, 1856, the date at which the evidence indicates that the original sale was made to Mrs. Toler, due five years after this date, bearing interest at ten per cent per annum. This note, as executed by Maughs, was evidently delivered to Chester Hubbard, for it was found among the assets which came into the possession of Mary R. Hubbard, as executrix of the last will and testament of her husband, Chester Hubbard, and she caused the same to be inventoried and appraised as part of the personal estate of Chester Hubbard. It was further shown by the evidence in this cause that this note was fully paid to the estate of Hubbard by the party in possession of the premises, who succeeded to the rights of Toler and Maughs under this contract of sale.

Upon this disclosure by the record of the facts in this case we see no necessity for even discussing the proposition as to whether or not Mr. Summers had the power to execute this bond. It may be conceded that he had no such power, still we are confronted with the facts in this case, which show that Chester Hubbard

fully ratified and acquiesced in, not only the execution of the bond by Summers, but also the assignment of that bond by the Tolers to Maughs—he received the fruits of their action, he accepted the note of Dr. Maughs and his estate received full payment of that note. This presents the action of the ancestor in relation to this transaction, and authority need not be cited to show that the plaintiffs, who are his heirs, are bound by his acts in respect to the sale of this property.

It is next contended by appellants that the contract of sale as made to Mrs. Toler, in which she agreed to pay $400, five years after the date of such contract of sale, was a contract falling within the Statute of Frauds and void for the reason that it was not to be performed within a year. Upon this proposition it is only necessary to say that the testimony in this case shows such performance of the contract at the time that it was made as to clearly place it outside of the Statute of Frauds. It was shown that upon this contract being made, the Tolers took possession of the premises with the full knowledge and consent of Chester Hubbard and made substantial improvements, and that Chester Hubbard, after the assignment of the title bond as executed by Summers to the Tolers, to Dr. Maughs, accepted a promissory note in writing executed by Dr. Maughs to him for the sum of $400, dated back to the time of the making of the contract with Mrs. Toler, on June 27, 1856.

It is also urged by appellants that the title bond did not provide for the possession of Mrs. Toler and cites Tyler on Ejectment, 554, to the effect that "a party entering under a contract which does not give possession is subject to ejectment at any time without notice." It is clear that the rule announced by the learned author is not applicable to this case, by reason of the facts shown by the evidence. The possession of the premises in dispute was given under the contract of sale made with Mrs. Toler in June, 1856, some

months prior to the execution of the title bond intro-
duced in evidence, and the title bond, whatever applica-
tion it may have to this case, as heretofore stated, was
simply to evidence the contract which was made by
the ancestor, June 27, 1856. The contract for the sale
of this land, even though construed as a verbal one,
has been completely performed; the possession of the
premises was delivered and the purchase-money has
been fully paid, therefore plaintiffs in this case are in
no position to interpose as a defense to this contract
the Statute of Frauds. [Bless v. Jenkins, 129 Mo. 647,
and cases cited.]

Appellants insist that Dr. Maughs had no vendible
interest in the land sought to be recovered by plain-
tiffs in this cause, therefore that no title or interest
could pass from Maughs to the defendants or their
grantors. Under the testimony in this case we are un-
able to give our assent to that contention. Mrs. Toler,
by her contract of purchase and entering into the pos-
session, acquired the equitable title to the land in dis-
pute; her interest in this land was assigned for a val-
uable consideration to Dr. Maughs and he went into
the possession of the premises and retained possession
until 1860 or 1861, when the Civil War began. His
interest by virtue of the assignment from Mrs. Toler
was fully recognized by the ancestor of the plaintiffs
to this action, by the acceptance of the note of $400 for
the purchase-money; hence, we hold that Maughs had
the equitable title to the premises in dispute, and upon
the payment of the purchase-money was entitled to
have decreed to him the legal title. This, under the
laws of this State, was an interest in land susceptible
of being conveyed. In Brant v. Robertson, 16 Mo. 129,
it was ruled that "where parties bind themselves by
agreement to convey land and to pay for it, equity
recognizes an interest in the land as already in the
purchaser, and the case is stronger when the purchaser
has actually paid in whole or in part, and in either case

the interest of the purchaser may be sold on execution, upon the principle that the vendor is to be regarded as seized in equity to the use of the purchaser." In Block v. Morrison, 112 Mo. l. c. 351, it was said by BLACK, J., speaking for the court: "The principle of law is well settled that, where there has been a contract for the sale of land, the vendor becomes the trustee of the land for the vendee, and that the vendee has an interest in the land which may be sold under execution," citing Papin v. Massey, 27 Mo. 445; Hart v. Logan, 49 Mo. 47; Morgan v. Bouse, 53 Mo. 219.

Again, it is insisted by appellants that Dr. Maughs abandoned his possession of the premises, hence he could not maintain an action for specific performance, and not being able to maintain that action, he had no equitable title to the premises. The testimony applicable to this particular contention shows that Dr. Maughs took possession of this property after purchasing the interest of Mrs. Toler and continued in possession until the spring or summer of 1861, when he went into the Confederate Army. According to the testimony of one of the witnesses Dr. Maughs left when the United States soldiers came. F. L. McHenry, in 1862, occupied the premises as Maughs's tenant, and paid the rent to Maughs's agent. McHenry continued to pay rent until the United States provost marshal notified him to pay no more rent because he (Maughs) was in the Confederate Army. The property was inclosed by a fence at the time Maughs left for the army. In our opinion this, when considered in connection with the conditions of the country at the time Dr. Maughs left for the army, did not constitute that voluntary abandonment of possession of the property as to be of any avail to the plaintiff in this case. [Hamilton v. Boggess, 63 Mo. 233.]

Appellants next insist that even though Dr. Maughs had a vendible interest in these premises, the sale by the sheriff in pursuance of the execution issued from

the circuit court of Howard county was insufficient to pass such title or interest. This may be conceded, so far as this case is concerned, and still it would not avail the plaintiffs; for the interest of Maughs, if it was not conveyed by the sheriff's deed, was conveyed by his quitclaim deed to Russell Hicks, in 1868, and by the quitclaim deed by the assignees in bankruptcy of Russell Hicks to this same property, to William Miller on March 31, 1879, through whom the defendants claim their title to this property. It will suffice, however, to say that in the case of Hicks v. Ellis, 65 Mo. 176, a sale made under the same execution on the same day and upon the same judgment was held valid. The deed is regular upon its face, recites every essential fact necessary to its validity, and we are unwilling, after the lapse of forty years, in this collateral proceeding, to say that it is void. In the discussion of the issuance of the execution and a sale, in Block v. Morrison, supra, the remarks of BLACK, J., might very appropriately be applied to this case. He said: ''And it follows that regularly an execution should not be issued out of this court to enforce that part of a judgment which is simply and solely a judgment of affirmance. But it does not follow that this sale should be held void. The practice was unsettled at that early day. In one case a sale under an execution issued out of this court on a judgment of affirmance was held regular. In another case three like sales were held valid, though voidable by a timely motion to quash, and, at a subsequent date, the court clearly stated that it would not disturb that ruling; and that, too, in a case where this deed was brought in question. More than fifty years have lapsed since this sale was made. Under these circumstances we are asked to hold this sale void, and this we decline to do.''

It may be added that the conclusions reached as to the sufficiency of this deed finds support in the case of Houck v. Cross, 67 Mo. 151. It was said by the

court in that case: "No testimony was adduced to explain the discrepancy in dates and it is doubtful whether any testimony on that subject was attainable after the lapse of half a century from the date of the transaction; and if the discrepancy were even of a more serious character, we should not feel inclined, under the circumstances, to view it with a very critical eye. If the sale was irregular in the particular complained of, the defendant in the execution, if damaged thereby, or his creditors, might by a timely application have had the same set aside. But it is wholly immaterial, so far as the present case is concerned, whether the sheriff gave any notice whatever. The deed is good upon its face, the title passed thereby and its validity cannot, for the alleged irregularity, be assailed in this action."

If we are to any longer regard equitable principles, the facts, as disclosed by the record in this cause, clearly entitled Dr. Maughs, upon the payment of the purchase-money to Chester Hubbard, to have the contract of sale as between Hubbard and Mrs. Toler specifically performed.

The defendants in this case having acquired all the rights possessed by Maughs and having fully paid the balance of the purchase-money, together with all interest, were entitled to the same equitable relief.

This case, briefly summed up, is an effort upon the part of the heirs of Chester Hubbard to recover real estate sold by him in his lifetime, the contract fully performed, and the purchase-money fully paid to the executrix of his estate to be distributed according to his wishes as expressed in his last will. The sale of this property to Mrs. Toler, the assignment of her interest to Dr. Maughs and the acquiring of his interest, through conveyances, by the present defendants, was fully recognized by the plaintiffs themselves. Evidence of this recognition is furnished by the answer of Mary R. Hubbard and J. R. Hubbard in case of Hicks v. the Hubbard Heirs in the Jackson Circuit

Court for the recovery of this property, wherein they disclaimed any interest in the same and affirmatively averred that William Miller is and was the true legal owner of the property.

The further recognition by the Hubbard heirs, that Miller upon plain, equitable principles was the owner of this property, is evidenced by the execution of the deeds by these heirs to him without a consideration, of date April 20, 1869.

Upon the facts as developed in the trial of this cause, regardless of the action of the probate court in undertaking to specifically perform this contract, the decree of the circuit court in holding these plaintiffs were estopped from claiming any interest in this land and quieting the title in the defendants, was clearly right, and in accord with good conscience and the administration of justice, as well as the well-settled principles of equitable jurisprudence.

While the transactions between the parties in respect to this land, by reason of the remote period at which they occurred, are not susceptible of that clear and satisfactory proof ordinarily required in actions of this character, still, when all of the facts and circumstances introduced in evidence are fully considered, it sufficiently indicates that Chester Hubbard in his lifetime sold this property to Mrs. Toler; that she went into possession; made valuable improvements; that she assigned her equitable title in the premises to Dr. Maughs, who after such assignment, went into possession and made additional improvements, and that defendants acquired the title of Dr. Maughs, and went into possession and still made further valuable and substantial improvements; that Chester Hubbard, during his lifetime, recognized this sale, accepted Dr. Maughs's note for $400 as part of the purchase-money for the premises; that his widow, after the death of Chester Hubbard, as executrix, recognized the sale of this property, proceeded to enforce the collection of the

note given for the purchase-money in pursuance of the contract of sale made with her husband in his lifetime, and did collect the balance of the purchase-money in full; that these plaintiffs fully recognized this sale by their answer heretofore mentioned, and the execution of the quitclaim deeds to William Miller referred to.

In view of this state of facts, it would be grossly inequitable to permit a recovery of this property, and the decree of the circuit court was proper; and having reached this conclusion, it is unnecessary to express an opinion as to the action of the probate court in undertaking to specifically perform the contract. The decree of the circuit court will be treated as a specific performance of the contract of sale as made by Chester Hubbard in his lifetime. Entertaining the views as herein expressed, the judgment and decree of the trial court should be affirmed, and it is so ordered.

All concur.