## DEARBORN ELECTRIC LIGHT & POWER CO. v. JONES.

(Circuit Court of Appeals, Eighth Circuit. May 31, 1924.)

### No. 6427.

**1. Bankruptcy ⬅305—Court held to have power to require execution of conveyance to trustee.**

A court of bankruptcy, which, on the intervention of a third party claiming title to real property in possession of the trustee, determines that the equitable title is in bankrupt, has power as a court of equity to make its decision effective by requiring intervener to execute a conveyance of the legal title.

**2. Electricity ⬅4—Sale of property by electric light company held valid.**

Under Rev. St. Mo. 1919, § 10483, providing that no public utility corporation shall sell or incumber any part of its works or system necessary or useful in the performance of its duties to the public without consent of the state commission, but that such provision shall not prevent the sale of any property not necessary or useful for that purpose, and that a sale to a purchaser in good faith for value shall be conclusively presumed to have been of property not so necessary or useful, a sale of property by an electric light company to a purchaser in good faith for value, which did not interfere with service to its customers, *held* valid.

**3. Frauds, statute of ⬅129(8)—Not applicable to sale of property after delivery has been made and the price paid.**

Rev. St. Mo. 1919, § 2169, providing that "no contract for the sale of lands made by an agent shall be binding upon the principal unless the agent is authorized in writing to make said contract," is not applicable where complete possession and control of the property has been delivered by the seller and the price fully paid by the buyer.

**4. Vendor and purchaser ⬅38—Sale held not invalid for fraud.**

A sale of real estate, paid for in stock of the purchasing corporation, cannot be avoided for fraud because of misrepresentation as to the amount of paid-up stock of the corporation and the value of its property and business, where the stock was at the time, and for months afterward, worth and selling at par.

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**5. Corporations ⬅️➡️388(1)—Corporation by delivery and acceptance of payment for property sold held estopped to claim that sale was ultra vires.**

A corporation, which sold property and received payment in stock of another corporation, which it retained, and which stood by for two years while the purchaser was making changes and expenditures on the property, *held* estopped to claim that the transaction was ultra vires.

Appeal from the District Court of the United States for the Western District of Missouri; Arba S. Van Valkenburgh, Judge.

In the matter of the Dearborn Iron & Power Company, bankrupt; Joseph M. Jones, trustee. The Dearborn Electric Light & Power Company appeals from order of the District Court. Affirmed.

Lee C. Hull, of Kansas City, Mo. (Charles W. German, of Kansas City, Mo., on the brief), for appellant.

William G. Boatright and Ringolsky & Friedman, all of Kansas City, Mo. (M. L. Friedman and I. J. Ringolsky, both of Kansas City, Mo., on the brief), for appellee.

Before STONE and KENYON, Circuit Judges, and PHILLIPS, District Judge.

STONE, Circuit Judge. The Dearborn Electric Light & Power Company and the Dearborn Iron & Power Company were two corporations, under the laws of Missouri, engaged in business at the town of Dearborn, Mo. The Iron Company went into bankruptcy and the trustee (appellee) undertook to sell a portion of the assets of the estate. Among such assets sought to be sold was property decribed as "old light plant equipment." Deeming the above-quoted description to cover property claimed in ownership by it, the Light Company (appellant) filed this intervention in the bankruptcy proceeding, asserting its title to the property in question and asking for relief appropriate to make its title and possession effective. In his answer to this intervention, the trustee claimed ownership in the estate and, as to tracts· of real estate involved, prayed conveyances from intervener to perfect the paper title. The referee found for the trustee and, among other things, accorded the relief sought concerning the deeds by ordering intervener, within 10 days, to deliver to the trustee a quitclaim deed to the real estate involved. The order of the referee was, in all respects, affirmed. From such order of affirmance, the Light Company brings this appeal.

The property belongs to the Light Company unless it was sold to the Iron Company. The dispute is as to whether such sale was ever made. The issues concern that matter. The facts necessary to an understanding and determination of the issues presented here are as follows: The Light Company was incorporated in 1917 with an authorized capitalization of $5,000 fully subscribed, of which $3,000 was paid in. The six men who incorporated the company have since then comprised its list of stockholders and constituted its board of directors and its general officers. The purpose of the incorporation was to supply electric current to the inhabitants of Dearborn, Mo., a town of about 700 people. A power house was constructed and the necessary poles and wires for

distribution of current installed and customers were furnished current. In doing this work, the company borrowed $4,500 from the Bank of Dearborn upon a note indorsed by the six stockholders. It was, also, indebted to one of its stockholders for about $700. The venture was not profitable. In August, 1919, the Iron Company was incorporated by four men with an authorized stock of $500,000, in $100 shares. The business of the Iron Company was the manufacture of foundry products and patented articles and the operation of a light and power plant for its own use and for sale of current to consumers in Dearborn. There were some individuals who were stockholders and either directors or officials in both of these companies, or in one of them and the Bank of Dearborn, and one man, Gabbert, was an officer or director in all three. In the latter part of 1919, when the Iron Company was planning to build its plant at Dearborn, a proposition was made to its manager by Gabbert, the secretary of the Light Company, to inspect the property of the Light Company with a view to purchase. The result of negotiations was that the property was apparently sold to the Iron Company, that company taking possession in November, 1919. Thereafter, in December following, the Iron Company issued its capital stock in payment, as it supposed, of the purchase price. This stock was issued in seven certificates, one for 47 shares in the name of the Light Company and one for 5 shares each in the name of each of the stockholders of the Light Company except the stockholder who was a creditor also of that company, to whom was issued a certificate for 10 shares. All of the certificates were delivered to the secretary of the Light Company, who had conducted the negotiations and who was, also, the president of the Bank of Dearborn to which the Light Company was indebted. The certificate for 47 shares was intended as payment of the note of the Light Company in that bank. These certificates were never delivered by him to the stockholders, for reasons not entirely clear or free from dispute in the record. At the time of the above transaction, prior thereto and for 18 months thereafter, the stock of the Iron Company was selling at par. As soon as the Iron Company took possession of the property, in November, 1919, it operated it as it stood, supplying light from the old plant until about May of the following year, when it began supplying current from its own plant. Thereafter, it dismantled much of the equipment in the old plant, removing some of it to other places, but it continued to run its wires through the old plant, making use of the switchboard therein. Adjacent to the old plant, on a part of the land sold to the Iron Company, was a small residence. The Iron Company exercised ownership thereover by collecting the rents and changing the tenants. During all of this time, the poles, wires, and distributing apparatus of the old plant were utilized by the Iron Company exclusively. The old plant was also used by the Iron Company, to a limited extent, for storage of machinery and old equipment. After the Iron Company took possession, no effort was made by the Light Company, or any one connected with it, to control or operate any part of the property formerly owned by the Light Company. Five of the six stockholders of the Light Company, during all of this time, were customers of the Iron Company,

purchasing and paying for the current which it distributed to them, as to other citizens of Dearborn. The sixth stockholder owned no property necessitating use of current. In October, 1920, a dividend was declared by the Iron Company and each of the six stockholders of the Light Company received, as a dividend on the above stock issued to him, a check for $30. The Bank of Dearborn received a dividend check for $282 on account of the 47 shares held by it. All of the parties understood that these were dividend checks on the stock issued in payment for this property. All of these dividend checks were cashed by those to whom issued, except one, which seems to have been inadvertently not presented and which was filed as a claim against the estate of the Iron Company in this bankruptcy proceeding. The dividend check to the bank was applied to the payment of interest on the note of the Light Company. There was no attempt to repudiate or question this transaction or to interfere with the control of the Iron Company over this property until after the adjudication of bankruptcy in August, 1921. Although repeatedly promised by the secretary of the Light Company, the Iron Company was never able to get a deed to the real estate from the Light Company.

Appellant presents here seven points, four of which relate to or depend upon the evidence. Of the other three, one challenges the jurisdiction of the court as a federal court to make the order requiring a deed from the Light Company; another challenges the validity of the sale on the ground that it is prohibited by the statute of the state governing sales of public utility property; the third raises the statute of frauds.

[1] The challenge of jurisdiction does not go to the extent of denying that the bankruptcy court had no power to act at all in this matter. On the contrary, appellant states that the bankruptcy court had a right "to determine the status of the property so far as any equity claimed by the bankrupt estate was concerned." What is meant thereby is explained by the appellant in its brief as follows:

"That is to say, when the referee in bankruptcy had heard sufficient of the facts to determine whether, in his opinion, the bankrupt estate had an equitable interest in the property, there being no contention that the record title was not in the intervener, and if the bankruptcy court had decided that not only the record but the equitable title to the property, was in the intervener, then he should have ordered the trustee to disclaim; but, if the referee decided that the bankrupt estate had an interest in the property, then he could rightfully decline to disclaim and order the trustee to institute such action as would be necessary to recover the property, which, of course, would have been an order directing that the trustee bring an action in specific performance. In either event, the jurisdiction of the referee would have ended with such an order and he could not make a decree that would otherwise affect this property."

In short, the challenge is merely to the requirement of specific performance; that is, execution of the deed to make the equitable title, found by the referee, a complete legal title. The contention of appellant means that the court could decide rights but would have no power to enforce them when so decided. In Virginia v. West Virginia, 246 U. S. 565, at page 591, 38 Sup. Ct. 400, 402 (62 L. Ed. 883) the court said:

"That judicial power essentially involves the right to enforce the results of its exertion is elementary."

Also see Keller v. Potomac Elec. Co., 261 U. S. 428, 444; South Dakota v. North Carolina, 192 U. S. 286, 320, 24 Sup. Ct. 269, 48 L. Ed. 448; La Abra Silver Mining Co. v. United States, 175 U. S. 423, 457, 20 Sup. Ct. 168, 44 L. Ed. 223; In re Sanborn, 148 U. S. 222, 224, 13 Sup. Ct. 577, 37 L. Ed. 429; Gordon v. United States, 117 U. S. 697, 702, Append. 7 R. C. L. 1029, 1034.

The power of the trial court to determine the rights of these parties is not questioned. It is not disputed that the bankruptcy court is a court of equity nor that a court of equity could require execution of a deed, as here ordered. The jurisdiction to make the order exists for the reasons following: The trustee was in possession of the property; the intervener submitted itself to the jurisdiction of the bankruptcy court and presented to that court for determination the dispute as to title to the property; either party would have the right to ask and each party did ask, that its title to the property be established; there is no challenge of the power of the bankruptcy court to determine that dispute; the power to determine title necessarily involves the power to make such determination effective by any means within the power of that tribunal and the bankruptcy court, being a court of equity, has the power to act upon the persons of litigants and require such acts by them as necessary to effectuate its decrees.

[2] The challenge of invalidity on account of the statute governing the transfer of public utility property is based upon section 10483, Rev. St. Mo. 1919, which is as follows:

"No gas corporation, electrical corporation or water corporation shall hereafter sell, assign, lease, transfer, mortgage or otherwise dispose of or encumber the whole or any part of its franchise, works or system, necessary or useful in the performance of its duties to the public, nor by any means, direct or indirect, merge or consolidate such works or system, or franchises, or any part thereof, with any other corporation, person or public utility, without having first secured from the commission an order authorizing it so to do. Every such sale, assignment, lease, transfer, mortgage, disposition, encumbrance, merger or consolidation made other than in accordance with the order of the commission authorizing same shall be void. The permission and approval of the commission to the exercise of a franchise or permit under this chapter, or the sale, assignment, lease, transfer, mortgage or other disposition or encumbrance of a franchise or permit under this section shall not be construed to revive or validate any lapsed or invalid franchise or permit, or to enlarge or add to, the powers or privileges contained in the grant of any franchise or permit, or to waive any forfeiture. Nothing in this subsection contained shall be construed to prevent the sale, assignment, lease or other disposition by any corporation, person or public utility of a class designated in this subsection of property which is not necessary or useful in the performance of its duties to the public, and any sale of its property by such corporation, person or public utility shall be conclusively presumed to have been of property which is not useful or necessary in the performance of its duties to the public, as to any purchaser of such property in good faith for value."

This point is serious, but we think that it is not well taken, for the reason that the last part of the section would seem to nullify prohibition of the earlier part in so far as it relates to genuine sales made in good faith. There can be no question that this sale was intended by both

parties to be a genuine sale for a valuable consideration; hence, it would seem to come within the exception expressed in the last part of the section.

[3] It is also urged that the contract is illegal because within the prohibition of a part of section 2169, Rev. St. Mo. 1919, which reads as follows:

" * * * No contract for the sale of lands made by an agent shall be binding upon the principal, unless such agent is authorized in writing to make said contract."

The claim is that the secretary of the Light Company, who was the active factor in its behalf in the transaction, had no written authority. Such a statute has no application to a case where the complete possession and control of the property has been delivered by the seller and the purchase price fully paid by the buyer. If the contract was as claimed by appellee and found by the court, this statute would not be applicable because there was complete delivery of possession and full payment. Hubbard v. Glass Works, 188 Mo. 18, 38, 86 S. W. 82; McGinnis v. McGinnis, 274 Mo. 285, 297, 202 S. W. 1087; Swain v. Seamens, 9 Wall. 254, 273, 19 L. Ed. 554. There is, also, abundant ground for estoppel in connection with this contention. Swain v. Seamens, 9 Wall. 254, 273, 19 L. Ed. 554.

[4] The other four errors here urged are based on appellant's views of the facts and are answered by the evidence and by the presumption favoring the findings of a referee approved by the trial court. The first of these is "that the attempted purchase of the property in question from intervener was a fraud on the part of the bankrupt." This contention is based upon the argument that the Iron Company had misrepresented the amount of paid up stock and the value of its property and business. This is met by the evidence that the stock was at the time of the action and for many months before and thereafter, worth and selling at par.

[5] The second point of this character is that Gabbert, who was the cashier of the bank, the secretary of the Light Company and the one who actively conducted all of the negotiations (on the part of the Light Company) in connection with this sale, had no authority to and did not bind intervener as to the $4,700 of stock received by the bank and constituting part of the claimed purchase price of this property. The argument is that the bank could not legally accept stock in satisfaction of the note held by it and indorsed by solvent indorsers; that Gabbert was acting in a dual and antagonistic capacity and that the act of Gabbert, in receiving this stock for the Light Company, was ultra vires because that company had no authority to own stock in another corporation. Appellant is estopped by its conduct from raising any of these questions. It has acquiesced in the control of this property by the Iron Company for many months; it has sat by and seen that company make changes and incur expenditures and liabilities in connection with that property and it has taken and kept and never offered to return the fruits of the transaction.

The third of these points is that, in any event, the Light Company is entitled to a lien upon the property until it has been paid. The theory

of this contention is that the balance of the purchase price, covered by the certificate for 47 shares intended to meet the indebtedness of $4,500 at the bank, has never been paid because the transaction was repudiated by the Light Company the day following the issuance of this certificate. The proof claimed to show this repudiation consisted of a page in the corporate minute book of the Light Company. This minute is in form a repudiation of the entire transaction on the basis that it was a sale for cash. The referee found, and was justified in finding, that this minute was open to serious question. It fails to fit in with other established facts and has the earmark of untruth. With this evidence shaken and unbelieved, there is no basis for this contention.

The last contention is that this alleged sale was "merely in effect an option and was never consummated." We think there is no foundation for this position. This was a sale or it was not a sale. There is no proof that either party or any one connected with the transaction had in mind an option.

The decree should be and is affirmed.